## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**BILLY GHESS**                                                                                    **PLAINTIFF**

**v.**                                    **Case No. 2:19-cv-00021 KGB**

**BALEL KAID, YAHYA ALJOMY,**
**and MAHAMED KAID**                                                                **DEFENDANTS**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Billy Ghess filed suit against defendants Balel Kaid,[1] Yahya Aljomy, and Mahamed Kaid alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and the Arkansas Minimum Wage Act, Ark. Code Ann. § 11-4-201, *et seq.* ("AMWA"). A bench trial was held in this matter on Monday, February 24, 2020.

### I.      Procedural Background

On or about January 11, 2018, Mr. Ghess filed suit against Parkin Food Mart, LLC, in Case No. 2:18-cv-00011 KGB (Dkt. No. 1 in Case No. 2:18-cv-00011). Mr. Ghess served the complaint and summons, and Parkin Food Mart, LLC, answered (Dkt. Nos. 2, 4 in Case No. 2:18-cv-00011). Discovery proceeded in that case, and Parkin Food Mart, LLC, responded to Mr. Ghess's interrogatories and requests for production of documents (Pl.'s Tr. Ex. 4). Mr. Ghess filed an unopposed motion to dismiss without prejudice the action, which the Court granted (Dkt. Nos. 13, 14 in Case No. 2:18-cv-00011).

---

[1] Mr. Ghess named Balel Kaid as a separate defendant (Dkt. No. 1). When filing an answer, Balel Kaid's counsel changed the spelling of his first name, spelling it "Belal" Kaid (Dkt. No. 2, at 7). In pretrial disclosures, his counsel spelled the name "Balel" Kaid (Dkt. No. 9, at 3). For purposes of this Order, the Court will spell the separate defendant's name as "Balel" Kaid. The Court directs defense counsel to inform the Court in writing within 10 days from the entry of this Order of the correct spelling of his client's name.

On or about February 15, 2019, Mr. Ghess commenced the current action pursuant to the FLSA and AMWA seeking proper minimum and overtime compensation against individual defendants Balel Kaid, Yahya Aljomy, and Mahamed Kaid in Case No. 2:19-cv-00021 KGB (Dkt. No. 1).[2]  Balel Kaid and Mahamed Kaid answered the complaint (Dkt. No. 2).  Although he was served with the complaint and summons personally by a process server, separate defendant Yahya Aljomy did not answer or otherwise appear to defend in this case (Dkt. No. 5).  Defendants Balel Kaid and Mahamed Kaid appeared at trial, testified, and through their counsel defended against Mr. Ghess's allegations.  By agreement, the parties admitted Plaintiff's Trial Exhibit 1, which is an estimate of Mr. Ghess's alleged damages, and Defendants' Trial Exhibits 1, 2, and 3, which are federal and state tax returns for the Parkin Food Mart, LLC, for 2016, 2017, and 2018 respectively.  There are other exhibits included in the materials that were used as reference by counsel and the witnesses during the bench trial.

In written discovery responses exchanged prior to trial, Mahamed Kaid specifically claimed:  (1) Mr. Ghess was an independent contractor who performed work "not tangential to business activities," (2) there is no enterprise liability based on gross sales, making the FLSA inapplicable; (3) there were only three employees, making the AMWA inapplicable; and (4) Mahamed Kaid claimed that he could not be personally liable as he did not participate in day-to-day operations of the company, was only an investor, and was unaware of any decisions regarding hourly pay and work schedules of employees (Pl.'s Tr. Ex. 3, Int. 15).

---

[2]  Docket references that are not otherwise specified indicate citations to docket entries in Case No. 2:19-cv-00021 KGB.

## II.     Findings of Fact

1.      Mr. Ghess filed his complaint in this action on February 15, 2019, naming Mahamed Kaid, Balel Kaid, and Yahya Aljomy as defendants (Dkt. No. 1).

### A.     Parkin Food Mart, LLC, Ownership

2.      Mahamed Kaid and Balel Kaid maintain that, in 2016, they bought out a former partner of Yahya Aljomy and became part owners with Yahya Aljomy in the Parkin Food Mart, LLC.

3.      Mahamed Kaid and Balel Kaid each owned a 25% interest and Yahya Aljomy owned 50% interest in the Parkin Food Mart, LLC, at the time relevant to this lawsuit (Dkt. No. 20, at 1).

4.      Until approximately December 2018, defendants operated the Parkin Food Mart, LLC (Dkt. No. 20, at 1).

5.      After December 2018, defendants no longer operated the Parkin Food Mart, LLC.

6.      Prior to filing this lawsuit, Mr. Ghess sued the Parkin Food Mart, LLC; Mahamed Kaid was served with that suit, but that LLC dissolved around that same time.

7.      Balel Kaid testified that he walked away from his interest in the Parkin Food Mart, LLC, and he and Mahamed Kaid testified that they are unaware of who owns the Parkin Food Mart, LLC, now.

8.      There is also some evidence that Yahya Aljomy brought in a family member to take over Mahamed Kaid and Balel Kaid's interest in the Parkin Food Mart, LLC, so that the business did not shut down completely.

9.      Parkin Food Mart, LLC's, discovery responses in the initial lawsuit against the now-defunct LLC stated that Mr. Ghess worked at the store for cash (Pl.'s Tr. Ex. 4, Ints., 2, 5).

10.     Upon learning that the LLC dissolved, Mr. Ghess sued the three individual defendants in the current action.

11.     Yahya Aljomy is aware of the current lawsuit, according to Mahamed Kaid.

### B.     Ownership Of Other Business Entities

12.     According to Mahamed Kaid, he and Balel Kaid each owned a 50% interest in a convenience store on Seventh Street in West Memphis, Arkansas, referred to as Seventh Street Food Mart, LLC, at the same time they owned an interest in the Parkin Food Mart, LLC.

13.     The Seventh Street Food Mart, LLC, was open during 2017 and was about the same size as the Parkin Food Mart, LLC.

14.     According to Mahamed Kaid, he ran the Seventh Street Food Mart, LLC, while Balel Kaid ran Parkin Food Mart, LLC, during the time relevant to this lawsuit.

15.     Mahamed Kaid and Balel Kaid worked at the Seventh Street Food Mart, LLC, during 2017.

16.     In the last three years, Balel Kaid only worked at Seventh Street Food Mart, LLC, and Parkin Food Mart, LLC.

### C.     General Operation Of Parkin Food Mart, LLC

17.     At the time defendants operated it, the Parkin Food Mart, LLC, was a convenience store that sold gasoline, snacks, and hot food cooked on premises.

18.     Balel Kaid worked approximately five to seven days per week in the Parkin Food Mart, LLC.

19.     Typical operating hours for the Parkin Food Mart, LLC, were 4:00 a.m. to midnight or eventually to 10:00 p.m. or 11:00 p.m. toward the end, seven days per week.

20.    There were two shifts usually, a morning shift and an evening shift, at the Parkin Food Mart, LLC.

21.    Typically two employees or more worked on a shift at the Parkin Food Mart, LLC.

22.    Balel Kaid usually worked the morning shift at the Parkin Food Mart, LLC, from approximately 4:00 a.m. to a little before noon and then left the store.

23.    Balel Kaid acted as the manager when he worked his shift.

24.    Yahya Aljomy also sometimes worked in the Parkin Food Mart, LLC, during the relevant time, working the evening shift usually.  He came in around 2:00 to 10:00 or from 12:00 to 10:00.

25.    When Yahya Aljomy worked his shift, he also was the manager, according to Balel Kaid.

26.    Employees did not punch a time clock at the Parkin Food Mart, LLC.

27.    Balel Kaid claims not to have known of any individuals who worked for cash as needed at the Parkin Food Mart, LLC.

28.    According to Balel Kaid, at all times, only Balel Kaid and Yahya Aljomy could hire or fire employees at the Parkin Food Mart, LLC.

29.    Balel Kaid worked as a cashier, made sure orders were coming in as needed, ran the kitchen, and just basically did a bit of everything including paperwork.  He testified that there was nothing that he did not do at the Parkin Food Mart, LLC.

30.    Sherry Gillon usually worked with Balel Kaid on the day shift at the Parkin Food Mart, LLC.

31.    Night shift employees at the Parkin Food Mart, LLC, were usually Yahya Aljomy, when he was available, and Viola Jones or Lillie Mems, according to Balel Kaid.

32.     Yahya Aljomy drove a truck and traveled out of the country, all of which took him away from the Parkin Food Mart, LLC, sometimes for months at a time including during 2017 and 2018.

33.     That is when Mohammad Alsaqqaf, also known as Alex, came in to take Yahya Aljomy's place.

34.     Yahya Aljomy brought Mohammad Alsaqqaf in to work sometime Spring or Summer 2017 until the end of 2017 or sometime in 2018, according to Balel Kaid.

35.      Mohammad Alsaqqaf worked as a cashier, just working the register.

36.     According to Balel Kaid, if there was any trouble or a problem Mohammad Alsaqqaf could not fix, Mohammad Alsaqqaf would call Balel Kaid or Mahamed Kaid.

37.     Mohammad Alsaqqaf had some authority but not 100% management authority at the Parkin Food Mart, LLC, according to Balel Kaid.   For example, if an order came in, Mohammad Alsaqqaf could take it.  If a customer did not get his gas or an employee failed to show up for work, then Mohammad Alsaqqaf would call Balel Kaid or Mahamed Kaid, based on Balel Kaid's testimony.

38.     Employees of the Parkin Food Mart, LLC, were given checks for their pay.

39.     The bookkeeper wrote out the pay checks, according to Balel Kaid.

40.     Balel Kaid called the bookkeeper to give her the numbers for the hours and wages, according to Balel Kaid.

41.     It took approximately 278 employee hours per week to run the Parkin Food Mart, LLC, based on Balel Kaid's testimony.

42.     Mr. Ghess admitted into evidence IRS W-2 forms for four individuals:   Lillie Mems, Mohammad Alsaqqaf, Sherry Gillon, and Viola Jones, who Balel Kaid testified represented

all of the employees on the Parkin Food Mart, LLC,'s payroll in 2017.   These records total

$42,280.56 in W-2 wages, roughly 4,974 hours at Arkansas's minimum wage of $8.50 per hour

during 2017 (Pl.'s Tr. Ex. 2).

43.     These figures leave approximately 8,926 unaccounted for employee hours to

account for approximately 13,900 hours if Parkin Food Mart, LLC, was open 50 weeks per year

operating on the schedule with the number of employees each shift Balel Kaid testified about.

### D.     Mr. Ghess's Work At Parkin Food Mart, LLC

44.     According to Mr. Ghess, Balel Kaid asked him one day if he wanted a job at the

Parkin Food Mart, LLC, and Balel Kaid told him to come back to work that night.

45.     Mr. Ghess knows Mahamed Kaid and Yahya Aljomy, too.

46.     Mr. Ghess understood Balel Kaid and Yahya Aljomy were owners at the Parkin

Food Mart, LLC.

47.     Mr. Ghess testified that he worked with Balel Kaid and Yahya Aljomy.

48.     According to Mr. Ghess, Balel Kaid set Mr. Ghess's work hours.

49.     Mr. Ghess testified that he worked at the Parkin Food Mart, LLC, from April to

December 2017, Monday through Sunday, from 6:00 p.m. to 11:00 p.m. on Sunday and from 6:00

p.m. to midnight the remaining nights of the week.

50.     Mr. Ghess testified that he also would come into the Parkin Food Mart, LLC, at

other hours to do extra duties sometimes if Balel Kaid, Yahya Aljomy, or the other employees

needed him.  Those extra duties and extra work usually lasted about an hour or two each time.

51.     Mr. Ghess testified that he came in on Tuesday or Wednesday morning to assist in

unloading the truck at the Parkin Food Mart, LLC, which usually took about an hour.

52.    When Mr. Ghess came to the Parkin Food Mart, LLC, during the day to unload trucks or perform other tasks, Sherry Gillon would be working and sometimes Balel Kaid or Mahamed Kaid would be there or show up.

53.    Mr. Ghess testified that he saw Mahamed Kaid at the Parkin Food Mart, LLC, during the day, a few times per month, when he worked there.

54.    Balel Kaid admitted that Mahamed Kaid was at the Parkin Food Mart, LLC, on occasion but claims Mahamed Kaid did not run the cash register there.

55.    Mr. Ghess testified that he worked with Mahamed Kaid and Balel Kaid on the day shift and on the night shift on occasion.

56.    Usually, three people worked with Mr. Ghess at the Parkin Food Mart, LLC, including Mr. Ghess.  Mohammad Alsaqqaf ran the register, Viola Jones worked the food, and Mr. Ghess was the stocker, according to Mr. Ghess.

57.    Mr. Ghess testified that he did not know Mohammad Alsaqqaf before he started to work with Mohammad Alsaqqaf at the Parkin Food Mart, LLC.

58.    According to Mahamed Kaid's written discovery responses, Sherry Gillon, if she had testified at trial, would have stated that Mr. Ghess never ran a cash register and instead he would "clean floors, cooler, parking lot and other small tasks." (Pl.'s Tr. Ex. 3, Int. 2).  Further, Ms. Gillon would testify that she knew Mr. Ghess "was paid in cash" (*Id.*).

59.    Further, Mahamed Kaid maintains:  "Plaintiff was not employed as a general employee." (Pl.'s Tr. Ex. 3).  Mahamed Kaid admits:  "Plaintiff was paid cash by an employee, cashier, to do duties that should have been performed by him.  The acts performed by Plaintiff included small cleaning, pickup and are not essential to the operation of the business.  Plaintiff was never employed by company and was an independent contractor based on duties." (*Id.*).

60.     According to Mr. Ghess, his job duties at the Parkin Food Mart, LLC, included stocking coolers, emptying garbage cans inside and out, cleaning the bathrooms, stocking out on the floor, keeping the parking lot clean, and performing whatever other tasks he needed to do.

61.     Mr. Ghess testified that he never worked the cash register or ran credit cards when he worked at the Parkin Food Mart, LLC.

62.     Mr. Ghess would speak with a gas distributor who called; he would read the ticket off of the diesel, regular, etc.  She called between 8:30 and 9:00 p.m. approximately, and Mr. Ghess recalled her calling about every night.  Mr. Ghess did not characterize this as a job duty to answer her calls, but he described helping the cashier or cook by answering the phone when it rang.

63.     Parkin Food Mart, LLC, banked with Evolve, which according to publicly available information has its corporate headquarters in Memphis, Tennessee, with locations in Arkansas and other states.  https://www.getevolved.com/contact/locations/

64.     Flash Market, which is headquartered in West Memphis, Arkansas, supplied gasoline to the Parkin Food Mart, LLC.

65.     Mr. Ghess claims that he was guaranteed to work 42 hours each week usually and sometimes worked 43 to 45 or 46 hours per week.

66.     Mr. Ghess recalled some weeks that he worked fewer than 40 hours, but he testified that there were not many of those weeks.

67.     According to Mr. Ghess, he was paid every Sunday night at 11:00 p.m. $300 cash each week.

68.     Whoever ran the cash register at that time would pay Mr. Ghess, which meant Mohammad Alsaqqaf usually and Balel Kaid sometimes paid him.

69.     Mr. Ghess understood that Balel Kaid set it up for Mohammad Alsaqqaf to pay him every Sunday night at 11:00 p.m.

70.     According to Mr. Ghess, if the Parkin Food Mart, LLC, had paid him the Arkansas minimum wage for the entire time of his work there, he would be owed approximately $6,000.00.

71.     Mr. Ghess claimed he worked 36 weeks for the Parkin Food Mart, LLC, in the three years before he filed his lawsuit (Pl.'s Tr. Ex. 1).

72.     Mr. Ghess also estimated the amount of money he was paid while working at the Parkin Food Mart, LLC, during that time (Pl.'s Tr. Ex. 1).

73.     Mr. Ghess submitted an estimate of damages and liquidated damages he claims to be owed in this lawsuit (Pl.'s Tr. Ex. 1).

74.     Mr. Ghess's employment at the Parkin Food Mart, LLC, ended at the end of 2017.

75.     According to Mr. Ghess, Balel Kaid accused him of a problem with the cooler or leaving something out of the cooler that caused water to be all over the floor.  Then, Balel Kaid accused Mr. Ghess of coming in drunk and demanding money.  According to Mr. Ghess, Balel Kaid suspended Mr. Ghess for two days, but then Balel Kaid never contacted Mr. Ghess to return to work and, according to Mr. Ghess, never paid him his last week of pay of approximately $300.00.

76.     Balel Kaid claims that, if Mr. Ghess did work at the Parkin Food Mart, LLC, it was not authorized.

77.     After Mr. Ghess filed this lawsuit, Mr. Ghess testified that Mahamed Kaid came to his house and that he talked to Mahamed Kaid, Balel Kaid, Yahya Aljomy, and Sherry Gillon about his claims.

78.     Balel Kaid admitted that, after being confronted by Mr. Ghess, he never asked Mohammad Alsaqqaf or Yahya Aljomy if Mr. Ghess was employed or owed money by the Parkin Food Mart, LLC.

79.     Mahamed Kaid claimed the Parkin Food Mart, LLC, was barely paying its bills.

80.     According to Mahamed Kaid, Balel Kaid told him every day that money was short at the Parkin Food Mart, LLC.

81.     According to Balel Kaid, sales were going down daily at the Parkin Food Mart, LLC.

82.     Mahamed Kaid's discovery response indicates that annual gross volume of sales made or business done in 2017 at Parkin Food Mart, LLC, was $394,158.00 and in 2016 was $252,770.00 (Pl.'s Tr. Ex. 3, Int. 15).

83.     From January 1, 2017, to January 1, 2019, the Arkansas minimum wage was $8.50 per hour, as applied to employers who employed four or more employees.  Ark. Code Ann. § 11-4-210(a)(2).

84.     As of January 1, 2017, the federal minimum wage was $7.25 per hour.  *Minimum Wage*, Department of Labor, https://www.dol.gov/agencies/whd/minimum-wage.

85.     Based on written discovery responses, Mahamed Kaid did not maintain or keep records of the Parkin Food Mart, LLC.  Instead, he claims that, if any records exist, they are in the possession of Yahya Aljomy, with whom Mahamed Kaid lost contact.

86.     According to Balel Kaid, he does not know of any records reflecting what times Mr. Ghess would have worked at the Parkin Food Mart, LLC.  Further, according to Balel Kaid, there would be no record of how much Mr. Ghess was paid.

### III.     Conclusions of Law

#### A.     Application Of The FLSA And The AMWA

The FLSA statute broadly defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  The Supreme Court noted that the FLSA defines the employment relationship "expansively" and with "striking breadth."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  Accordingly, the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  *Id.*  Also consistent with the FLSA's remedial purpose, the Supreme Court has stated that the FLSA should be construed "liberally to apply to the furthest reaches consistent with congressional direction."  *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 296 (1985) (quoting *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959)).  As a result, courts determining employer status look to the economic realities of the circumstances rather than technical common law concepts of agency.  *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961).

The FLSA mandates that every employer pay each of his or her employees a minimum wage and overtime compensation for any workweek that the employees are:  (1) "engaged in commerce or in the production of goods for commerce" (individual coverage) or (2) "employed in an enterprise engaged in commerce or in the production of goods for commerce" (enterprise coverage).  29 U.S.C. §§ 206(a), 207(a).  To demonstrate individual coverage under the FLSA, a plaintiff must prove that, at times relevant to his claim, he was engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 207(a)(2)(C).  Likewise, in order to demonstrate enterprise coverage under the FLSA, a plaintiff must prove that his employer was an enterprise

engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 203(s)(1).  Either individual or enterprise coverage is enough to invoke FLSA protection.

### 1.    FLSA:  Individual Coverage

The FLSA provides "coverage for 'employees who [are] themselves engaged in commerce or in the production of goods for commerce.'"  *Reich v. Stewart*, 121 F.3d 400, 405 (8th Cir. 1997) (quoting *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 517 (1973)).  "For individual coverage, '[t]he burden of proof lies on employees to establish that they were engaged in interstate commerce, or in the production of goods, and that such production was for interstate commerce.'"  *Miller v. Centerfold Entm't Club, Inc.*, No. 6:14-CV-6074, 2017 WL 3425887, at *3 (W.D. Ark. Aug. 9, 2017) (quoting *Joseph v. Nichell's Caribbean Cuisine, Inc.*, 862 F. Supp. 2d 1309, 1312 (S.D. Fla. 2012)).  To meet his burden, Mr. Ghess must show that he was "engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 207(a)(2)(C).  The test "is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it."  *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943).  For an employee to be "engaged in commerce" under the FLSA, the employee must directly participate "in the actual movement of persons or things in interstate commerce" by "(i) working for an instrumentality of interstate commerce, *e.g.*, transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails, or travel."  *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006) (citing 29 C.F.R. § 776.23(d)(2); 29 C.F.R. § 776.24); *see also* 29 C.F.R. § 776.10(b); *Schmidt v. Peoples Tel. Union of Maryville, Mo.*, 138 F.2d 13, 15 (8th Cir. 1943).

The Department of Labor's Field Operations Handbook states that individual coverage may exist for employees of even primarily local retail and service establishments under certain circumstances.[3]  Examples of covered activities include:

> (1)  ordering of supplies and goods by mail, telephone, and fax and receipt of goods ordered from out-of-state suppliers,
>
> (2)  processing of credit card purchases such as preparation of credit card slip initiating a transaction with an out-of-state credit card company or transmission of a credit card check to an out-of-state clearinghouse, and
>
> (3)  transmission of information regarding a customer's personal check to an out-of-state clearinghouse for approval.

Field Operations Handbook, Chapter 11, 11r01, (current as of July 27, 2020), *available at* https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-11#B11c00.

The record evidence is that Mr. Ghess did not work as a cashier or run the register at Parkin Food Mart, LLC.  Those who worked as cashiers and ran the register at Parkin Food Mart, LLC, likely do qualify for individual coverage based on the evidence before the Court.  *See, e.g.*, *Murray v. Stuckey's Inc.*, 939 F.2d 614 (8th Cir. 1991) (addressing FLSA claims brought by employees of roadside gas station/convenience stores); *Scalia v. Liberty Gas Station & Convenience Store, LLC*, 444 F. Supp. 3d 390 (N.D.N.Y. 2020) (same); *Vazquez v. Uooligan Gas Station Convenience Store, Inc.*, Case No. 2:18-cv-611-ftM-38NPM, 2020 WL 3211151 (M.D. Fla. May 22, 2020) (same); *Yasmin v. Triple T II, Inc.*, Case No. 8:19-cv-1158-T-36AAS, 2020 WL 418874 (M.D. Fla. Jan. 27, 2020) (same); *Hajiani v. Rose Servs., Inc.*, Case No. 1:12-cv-177-TWT, 2013 WL 2951062 (N.D. Ga. June 14, 2013) (same).

---

[3]   The Eighth Circuit has determined that although "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference, . . . [they] are entitled to respect under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), based on their persuasiveness."  *Baouch v. Werner Enterprises, Inc.*, 908 F.3d 1107, 1117 (8th Cir. 2018), *cert. denied*, 140 S. Ct. 122 (2019) (internal citations omitted).

Here, all parties agree that Mr. Ghess performed janitorial work, and Mr. Ghess testified that he answered telephones on occasion and assisted in unloading trucks with stock for Parkin Food Mart, LLC.  The Department of Labor's Field Operations Handbook states that individual coverage exists for individuals who perform maintenance or custodial work, such as a janitor, "if he or she is regularly and recurringly engaged in such activities as ordering or receiving goods from outside the state, handling or otherwise producing goods for shipment to other states, keeping records relative to interstate transactions, or using the telephone or the mails for interstate communication."  Field Operations Handbook, 11b04(b); *see also United States v. Corum*, 362 F.3d 489, 493 (8th Cir. 2004) ("It is well-established that telephones, even when used intrastate, are instrumentalities of interstate commerce."); *Miller*, 2017 WL 3425887, at *3 (concluding that plaintiff-dancers' regular use of disc jockey who streamed music over the Internet qualified plaintiffs for individual coverage under FLSA because the Internet is an instrumentality of interstate commerce).  Further, "[a] building maintenance or custodial employee will be considered to be individually covered if as a regular and recurring part of their duties they serve those portions of the building occupied by a tenant engaged in that location in interstate commerce or the production of goods for interstate commerce."  Field Operations Handbook, 11b04(c).  To assess this coverage, the Court looks to the nature of the work performed by the tenant and the type of work performed by the employee.  "For example, a janitor would not be considered covered  solely on the basis of taking a few minutes each day to empty waste baskets in an 'interstate' insurance office, or because, on occasion, called upon outside their regular duties to perform some incidental cleaning task in a bank.  Nor would the performance of maintenance or custodial services in those portions of the building occupied by an essentially local business provide a basis of coverage, if

the same work would not provide a basis of coverage for a worker employed by such a tenant." *Id.*

By virtue of these provisions, the Court determines that Mr. Ghess's activities are closely enough related to interstate commerce for purposes of individual coverage under the FLSA.

### 2.   FLSA:  Enterprise Coverage

A  defendant  is  subject  to FLSA enterprise coverage if  it  is  shown  that  it:   (1) "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and (2) has an "annual gross volume of sales made or business done [] not less than $500,000." 29 U.S.C. § 203(s)(1)(A).

The  handling clause only pertains to "goods or materials *that have been moved in or produced for commerce by any person.*"  *Id.* § 203(s)(1)(A)(i) (emphasis added).  The FLSA defines "commerce" as "trade, commerce, transportation, transmission, or communication *among the several States or between any State and any place outside thereof.*"  *Id.* § 203(b) (emphasis added).  The plain meaning of the handling clause is that it only applies to "goods" or "materials" that have been subject to *interstate* commerce.

> Under 29 U.S.C. § 203(r):
>
> "Enterprise" means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor.

29 U.S.C. § 203(r)(1).  If Parkin Food Mart, LLC, and the Seventh Street Food Mart, LLC, can be considered together as an "enterprise," then they would be subject to the requirement that any employee whose work for either or both companies totals more than 40 hours in a workweek be

paid overtime. *See* 29 U.S.C. § 207(a)(2)(C); 29 C.F.R. § 779.201.  To determine whether multiple business entities constitute a single enterprise, courts examine three factors:  (1) related activities; (2) unified operation or common control; (3) common business purpose.  *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 846-47 (8th Cir. 1975).  Because the Court concludes that Mr. Ghess qualifies for FLSA individual coverage and coverage under the AMWA as explained in this Order, the Court declines to, and need not, reach the issue of enterprise coverage under the FLSA.

### 3.    AMWA Coverage

The AMWA broadly defines an "employee" as "any individual employed by an employer," while excluding from this definition certain individuals in specific employment situations, such as bona fide independent contractors.  Ark. Code Ann. § 11-4-203(3).  The AMWA defines "employ" to mean "to suffer or permit to work."  Ark. Code Ann. § 11-4-203(2).  The AMWA defines "employer" as individuals and specified business entities, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee.  Ark. Code Ann. § 11-4-203(4)(A).  However, employer does not include any individual or specified business entity, "or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee for any work week in which fewer than four (4) employees are employed."  Ark. Code Ann. § 11-4-203(4)(B).  The Eighth Circuit has looked to "factors such as the control of hiring and firing of employees, control of the manner in which work is performed, and the fixing of employee wages in determining who is the 'employer.'"  *Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 802–03 (E.D. Ark. 1990) (citing *Wirtz v. Pure Ice Company*, 322 F.2d 259 (8th Cir. 1963); *Fruco Const. Co. v. McClelland*, 192 F.2d 241 (8th Cir. 1951)).  Consistent with the purpose of the four-factor test, no one factor is dispositive, but instead a court must consider

the economic realities and the circumstances of the whole activity.  *Baker v. Stone Cnty., Mo.*, 41 F. Supp. 2d 965, 980 (W.D. Mo. 1999) (citations omitted).

Defendants argue that the AMWA does not apply because the Parkin Food Mart, LLC, only had three employees, not the four required for application of the AMWA.  Mr. Ghess admitted into evidence Internal Revenue Service W-2 forms for four individuals:  Lillie Mems, Mohammad Alsaqqaf, Sherry Gillon, and Viola Jones, who Balel Kaid testified represented all of the employees on the Parkin Food Mart, LLC's, payroll in 2017.  These records total $42,280.56 in W-2 wages, roughly 4,974 hours at Arkansas's minimum wage of $8.50 per hour during 2017 (Pl.'s Tr. Ex. 2).  Defendants fail to reconcile their argument that the AMWA does not apply with Balel Kaid's testimony about these four employees on the payroll in 2017 at Parkin Food Mart, LLC.  Further, this count of four employees excludes Mr. Ghess, and for reasons explained in this Order, the Court concludes that Mr. Ghess was an employee of Parkin Food Mart, LLC, during the time relevant to his claim.

The record evidence also supports the conclusion that no fewer than four employees were employed for each of the 36 weeks Mr. Ghess worked.  *See* Ark. Code Ann. § 11-4-203(4)(A)–(B).  Even assuming Balel Kaid and Yahya Aljomy fall under the AMWA's "bona fide executive" exception and therefore are not included as employees, *see* Ark. Code Ann. § 11-4-203(3)(A), at least four employees worked each week at the Parkin Food Mart, LLC.  Balel Kaid testified that he usually worked with Sherry Gillon on the day shift at the Parkin Food Mart, LLC.  Further, Balel Kaid testified that night shift employees at the Parkin Food Mart, LLC, were usually Yahya Aljomy, when he was available, or Mohammad Alsaqqaf, when Yahya Aljomy was not available, and Viola Jones or Lillie Mems.  Mr. Ghess testified that, when he worked the night shift, he was one of three employees working and usually worked with Mohammad Alsaqqaf and Viola Jones.

This testimony accords with the W-2 forms of Mr. Alsaqqaf and Ms. Jones.  Mr. Alsaqqaf's W-2 reflects $14,040.00 in wages, which amounts to approximately 1,652 hours worked at a minimum wage of $8.50.  Ms. Jones's W-2 reflects $13,743.60 in wages, which amounts to approximately 1,616 hours worked at a minimum wage of $8.50.  Assuming an average shift lasted eight hours, Mr. Alsaqqaf would have worked approximately 206 shifts in 2017, and Ms. Jones would have worked approximately 202 shifts in 2017.  Mr. Ghess further testified that he occasionally worked with other individuals whom he referred to as Reba, Abdul, and Omar.  This evidence and testimony support the conclusion that at least four employees worked at the Parkin Food Mart, LLC, for each of the 36 weeks Mr. Ghess worked there.  Having examined all record evidence, the Court concludes the AMWA applies to Mr. Ghess's claim.

### B.     Employers And Employee Under The FLSA And The AMWA

The Supreme Court has instructed lower courts to interpret broadly the meaning of "employee" under the FLSA.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  Both the FLSA and the AMWA define an "employee" as "any individual employed by an employer" and an "employer" as anyone "acting directly or indirectly in the interest of an employer in relation to an employee."  *Compare* Ark. Code Ann. § 11-4-203, *with* 29 U.S.C. § 203.

In addition, Arkansas Administrative Code Title 010.14.1-112 provides that the Arkansas Department of Labor may rely upon federal precedent established by the FLSA in interpreting the AMWA.  Courts regularly use FLSA precedent to interpret the AMWA.  *See Karlson v. Action Process Serv. & Private Investigation, LLC*, 860 F.3d 1089, 1092 n.3 (8th Cir. 2017); *Harris v. Express Courier Int'l*, No. 5:16-CV-05033, 2017 WL 5606751, at *4 (W.D. Ark. Nov. 21, 2017).

1.      **Employer Status**

Employer is defined under the FLSA as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The Eighth Circuit has held that a corporate officer with operational control of the corporation's day-to-day functions is an employer within the meaning of the FLSA." *Simms v. Northport Health Servs. of Ark., L.L.C.*, No. 2:12–CV–02252, 2013 WL 2102974, at *2 (W.D. Ark. May 14, 2013) (citing *Wirtz v. Pure Ice Co., Inc.*, 322 F.2d 259, 262-63 (8th Cir. 1963)).

Based on the record evidence, the Court concludes that defendants were all employers of Mr. Ghess.  As an initial matter, given the inconsistent written discovery responses and trial testimony, the Court determines much of defendants' trial testimony was not credible.  The Court bases this determination on its observation of witnesses on the stand and a review of the entire record in this case.  The specific incidences the Court considers in reaching this determination include but are not limited to the following.  Despite admitting in written discovery that Mr. Ghess worked for Parkin Food Mart, LLC, Balel Kaid tried to disclaim that fact on the stand.  Despite claiming that Parkin Food Mart, LLC, lost money in the years they operated it, the tax returns produced by defendants showed fairly significant sales increases between 2016 and 2017.  Although trying to limit Mr. Ghess's role to that of a customer who frequented Parkin Food Mart, LLC, in the evening, defendants offered information based on purported knowledge of Sherry Gillon, who defendants claim worked the day shift at the Parkin Food Mart, LLC, that Mr. Ghess came in on the 6:00 p.m. to 12:00 a.m. shift and would clean floors, cooler, parking lot, and other small tasks.  Defendants also attempted to confine Mr. Ghess to minor tasks performed during the evening shift only, but the testimony was Ms. Gillon worked only the day shift, and record

evidence establishes that she was familiar with Mr. Ghess and his work, further discounting defendants' claims.

Based on the record evidence, the Court determines that Balel Kaid, Yahya Aljomy, and Mahamed Kaid each worked with Mr. Ghess at various times or observed Mr. Ghess performing work for Parkin Food Mart, LLC.  Further, based on defendants' own testimony, Balel Kaid, Yahya Aljomy, and Mahamed Kaid each had authority to exercise and did exercise day-to-day operational control over Parkin Food Mart, LLC.  These defendants had the power to hire and fire Mr. Ghess, to supervise Mr. Ghess, and to set Mr. Ghess's schedule and pay.  All three of these defendants took an active role in operating Parkin Food Mart, LLC, and shared in the management of the operation.  As a result, the Court determines that Balel Kaid, Yahya Aljomy, and Mahamed Kaid each qualified as employers, and collectively qualified as employers through Parkin Food Mart, LLC, under the FLSA and the AMWA.

### 2.     Employee Status

The FLSA defines an "employee" as "any individual employed by an employer" and defines "employ" as "to suffer or permit to work."  29 U.S.C. §§ 203(e)(1), 203(g).  "The test for employment under the [FLSA] is one of economic reality."  *Karlson v. Action Process Servicer & Private Investigations, LLC*, 860 F.3d 1089 (8th Cir. 2017) (quoting *Tony & Susan Alamo Found.*, 471 U.S. at 301) (internal quotation marks, alterations, and citations omitted).  "In determining whether an entity functions as an individual's employer, courts generally look to the economic reality of the arrangement."  *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) (citing *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961) ("[T]he 'economic reality' rather than 'technical concepts' is to be the test of employment")).  Courts typically analyze the following six factors of the economic-realities test:  (1) the degree of control exercised by the alleged employer; (2) the worker's

investment in the business; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative in performing the job; (5) the permanency of the relationship; and (6) the extent to which the work is an integral part of the alleged employer's business.  *See, e.g.*, *Whitworth v. French Quarter Partners, LLC*, No. 6:13-CV-6003, 2014 WL 12594213, at *3 (W.D. Ark. June 30, 2014); *see also Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla. 1997).  "[T]he ultimate question of '[w]hether or not an individual is an 'employee' within the meaning of the FLSA is a legal determination rather than a factual one.'"  *Karlson*, 860 F.3d at 1092–93 (quoting *Donovan v. Trans World Airlines, Inc.*, 726 F.2d 415, 417 (8th Cir. 1984)).

Based on the record before the Court, the Court determines that Mr. Ghess was an employee of defendants, individually and collectively, under both the FLSA and the AMWA, not an independent contractor.  The economic realities of their arrangement do not support defendants' argument that Mr. Ghess was an independent contractor.

### C.      Mr. Ghess's Pay Violated The FLSA And The AMWA

Further, where, as here, "an employer has not kept adequate records of wages and hours, its employees cannot be penalized by being denied a recovery of back wages on the ground that the precise extent of their uncompensated work cannot be proved."  *Dole v. Alamo Found.*, 915 F.2d 349, 351 (8th Cir. 1990).  "Rather, the employees are to be awarded compensation on the most accurate basis possible."  *Id.*  Mr. Ghess bears the burden of proving the extent of back wages to which he is entitled, but he may satisfy that burden by a just and reasonable inference.  After Mr. Ghess meets his burden, the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to challenge the reasonableness of the inference to be drawn from the employee's evidence.

Apart from the AMWA's more relaxed provisions related to coverage, "[t]he FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner." *Carter v. Primary Home Care of Hot Springs, Inc.*, No. 6:14-CV-6092, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015).

Mr. Ghess testified that he worked at the Parkin Food Mart, LLC, from April to December 2017, Monday through Sunday, from 6:00 p.m. to 11:00 p.m. on Sunday and from 6:00 p.m. to midnight the remaining nights of the week. Mr. Ghess testified that he also would come into the Parkin Food Mart, LLC, at other hours to do extra duties sometimes if Balel Kaid, Yahya Aljomy, or the other employees needed him. Those extra duties and extra work usually lasted about an hour or two each time. Mr. Ghess testified that he came in on Tuesday or Wednesday morning to assist in unloading the truck at the Parkin Food Mart, LLC, which usually took about an hour. When Mr. Ghess came to the Parkin Food Mart, LLC, during the day to unload trucks or perform other tasks, Sherry Gillon would be working and sometimes Balel Kaid or Mahamed Kaid would be there or show up. Having considered all of the record evidence before the Court, the Court credits Mr. Ghess's testimony with respect to the hours he worked for defendants. Defendants admit no employee punched a time clock, and defendants have come forward with no record evidence from which to establish regular hours worked for any employee.

An FLSA cause of action "may be commenced within two years after the cause of action accrued . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). Mr. Ghess filed suit within two years of the alleged violation.

23

For hours up to 40 hours in a work week during the relevant period, Mr. Ghess is entitled to $8.50 per hour as minimum wage under Arkansas law, which is higher than the federal minimum wage during that period.  Ark. Code Ann. § 11-4-210(a)(2).  With respect to hours in a work week more than 40 hours, Mr. Ghess is entitled to a rate of not less than one and one-half times the regular rate of pay or in this case one and one-half times minimum wage.  Ark. Code Ann. § 11-4-211(a).  The evidence in the record is that Mr. Ghess received $300.00 in cash for each week he worked, nothing more.  Mr. Ghess is not entitled to a double recovery, despite prevailing under the FLSA and the AMWA.

**D.**     **Mr. Ghess's Measure Of Damages**

An employee's remedies for violations of the AMWA are as follows:

(a)(1)  Any employer who pays any employee less than the minimum wages, including overtime compensation or compensatory time off as provided by this subchapter, to which the employee is entitled under or by virtue of this subchapter shall:

. . .

(B)  Be liable to the employee affected for:

(i)  The full amount of the wages, less any amount actually paid to the employee by the employer; and

(ii)  Costs and such reasonable attorney's fees as may be allowed by the court.

(2)  The employee may be awarded an additional amount up to, but not greater than, the amount under subdivision (a)(1)(B)(i) of this section to be paid as liquidated damages if the employee proves the violation was willful.

Ark. Code Ann. § 11-4-218(a).

The Court credits Mr. Ghess's claim for 36 weeks of work (Pl.'s Tr. Ex. 1).  Based on Mr. Ghess's trial testimony, the Court determines that his regular work week consisted of 42 hours of work each week, on average.  This equates to working the scheduled hours during the evening

shift and working approximately one additional hour each week to unload trucks and perform tasks at the Parkin Food Mart, LLC, during the day shift.  In other words, the Court rejects the 50 hours of work each week estimated in Mr. Ghess's trial exhibit, with ten hours of overtime estimated each week (Pl.'s Tr. Ex. 1).

As a result, Mr. Ghess is entitled to 40 hours compensated at $8.50 each week, totaling $340.0 each week, and two hours compensated at $12.75 each week, totaling $25.50 each week. Mr. Ghess worked for 36 weeks, resulting in wages and overtime compensation earned of $13,158.00.  Mr. Ghess testified that he was paid $300.00 in cash each week except his last week, totaling $10,500.00.  As a result, defendants still owe to Mr. Ghess as damages for wages and overtime compensation earned but not paid $2,658.00.

The Court in its discretion finds that Mr. Ghess also is entitled to an award of liquidated damages equal to the full amount of minimum wages and overtime compensation owed. "Liquidated damages are not considered punitive, but are 'intended in part to compensate employees for the delayed payment of wages owed under the FLSA.'"  *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 942 (8th Cir. 2008) (quoting *Hultgren v. Cnty. of Lancaster, Neb.*, 913 F.2d 498, 509 (8th Cir. 1990)).  The Eighth Circuit instructs that "[a]n award of liquidated damages under § 216(b) is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA."  *Braswell v. City of El Dorado*, 187 F.3d 954, 957 (8th Cir. 1999).  "The employer bears the burden of proving both good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception."  *Chao*, 547 F.3d at 941–42 (quotation and citation omitted).  The applicable version of the AMWA's liquidated damages provision, Ark. Code Ann. § 11-4-218(a),

25

is materially identical to the FLSA and is applied according to the same standard.  *See Fochtman v. DARP, Inc.*, No. 5:18-cv-5047, 2019 WL 4740510, at *12 n.17 (W.D. Ark. Sept. 27, 2019).

Here, defendants have failed to carry their burden of showing that they acted in good faith and with reasonable grounds in failing to pay wages to Mr. Ghess.  To show good faith, "the employer must establish an honest intention to ascertain and follow the dictates of the FLSA." *Chao*, 547 F.3d at 942 (quotation and citation omitted).  For these reasons, the Court awards Mr. Ghess liquidated damages in the amount of $2,658.00.

Mr. Ghess also may file a separate petition with the Court for costs and reasonable attorney's fees to which defendants may respond.

The Court finds that all defendants are jointly and severally liable for Mr. Ghess's unpaid wages, liquidated damages, and costs and reasonable attorney's fees.  *See Collins v. Barney's Barn, Inc.*, No. 4:12CV00685 SWW, 2014 WL 12639393, at *5 (E.D. Ark. Sept. 11, 2014) (concluding that individual defendants and corporation were jointly and severally liable for plaintiffs' unpaid wages); *Marin v. Aida, Inc.*, 992 F. Supp. 2d 913, 914–15 (W.D. Ark. 2014) (finding that defendant and corporation were joint employers and therefore jointly and severally liable for unpaid wages); *Solis v. Hill Country Farms, Inc.*, 808 F. Supp. 2d 1105, 1115 (S.D. Iowa 2011) *aff'd,* 469 F. App'x 498 (8th Cir. 2012) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.").

## IV.    Claims Against Yahya Aljomy

Pursuant to Rule 55 of the Federal Rules of Civil Procedure, default judgment is appropriate when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise[.]"  Fed. R. Civ. P.

55(a).  When a party "has failed to plead or otherwise defend" against a pleading listed in Rule 7(a), entry of default under Rule 55(a) must precede grant of a default judgment under Rule 55(b). *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 783 (8th Cir. 1998).

A default judgment entered by the court binds the party facing the default as having admitted all of the well pleaded allegations in the plaintiff's complaint.  *See Taylor v. City of Ballwin*, 859 F.2d 1330, 1333 n.7 (8th Cir. 1988); Fed. R. Civ. P. 55(b)(2).  "It is within the discretion of the Court to enter a default judgment against a party who has failed to plead or defend."  *United States v. U.S. Currency in the amount of $13,000.00*, No. 12–00811–CV–C–NKL, 2012 WL 5422316, at *1 (W.D. Mo. Nov. 6, 2012).  "Prior to the entry of a default judgment, a court should satisfy itself that the plaintiff is entitled to judgment by reviewing the sufficiency of the complaint and the substantive merits of the plaintiff's claim."  *CitiMortgage, Inc. v. First Residential Mortg. Servs. Corp.*, No. 4:13CV00703 AGF, 2014 WL 721914, at *2 (E.D. Mo. Feb. 24, 2014).

Proof of personal service on separate defendant Yahya Aljomy has been established by the filing of the return of service (Dkt. No. 5; Pl.'s Tr. Ex. 5).  Further, separate defendant Mahamed Kaid testified that separate defendant Yahya Aljomy is aware of the current lawsuit.  In addition, Mr. Ghess testified at trial that, after he filed this lawsuit, Mahamed Kaid came to his house and that he talked to Mahamed Kaid, Balel Kaid, Yahya Aljomy, and Sherry Gillon about his claims in this lawsuit prior to trial.

On November 24, 2020, the Clerk of Court entered default against Mr. Aljomy pursuant to Federal Rule of Civil Procedure 55(a) (Dkt. No. 24).  Having considered the record in this case, the Court determines it is appropriate to enter default judgment pursuant to Federal Rule of Civil Procedure 55(b) against separate defendant Yahya Aljomy.

## V.      Conclusion

For the foregoing reasons, the Court finds in favor of Mr. Ghess and against defendants Balel Kaid, Yahya Aljomy, and Mahamed Kaid jointly and severally on his FLSA and AMWA claims against defendants in the amount of $2,658.00 in damages and $2,658.00 in liquidated damages.  The parties may brief separately any request for costs and reasonable attorney's fees.

It is so ordered this 27th day of November, 2020.

Kristine G. Baker
United States District Judge